**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Stacey Schneider,<br><br>                    Plaintiff,<br><br>v.<br><br>Andrew Saul,<br>Commissioner of Social Security,<br><br>                    Defendant. | No. CV-19-0147-TUC-BGM<br><br><br>**ORDER** |

Currently pending before the Court is Plaintiff's Opening Brief (Doc. 16). Defendant filed his Answering Brief ("Response") (Doc. 19), and Plaintiff filed her Reply (Doc. 20). Plaintiff brings this cause of action for review of the final decision of the Commissioner for Social Security pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). Compl. (Doc. 1). The United States Magistrate Judge has received the written consent of both parties and presides over this case pursuant to 28 U.S.C. § 636(c) and Rule 73, Federal Rules of Civil Procedure.

## I.      BACKGROUND

### A.      *Procedural History*

On September 1, 2015, Plaintiff protectively filed a Title II application for Social Security Disability Insurance Benefits ("DIB") and on December 10, 2015 filed a Title XVI application for Supplemental Security Income ("SSI") alleging disability as of November 30, 2010 due to manic depression, Bipolar I, psychotic episodes, paranoia, audio

and visual hallucinations, Fibromyalgia, as well as a list of other conditions.[1] *See* Administrative Record ("AR") at 21, 22–24, 29, 36, 51–53, 87–88, 91–92, 99–101, 165, 172, 201, 205, 207, 234, 254, 748–56. The Social Security Administration ("SSA") denied this application on November 13, 2015. *Id.* at 21, 87–99, 107–09. On December 10, 2015, Plaintiff filed a request for reconsideration, and on March 21, 2016, SSA denied Plaintiff's application upon reconsideration. *Id.* at 21, 100–01, 111–19. On March 25, 2016, Plaintiff filed her request for hearing. *Id.* at 21, 120. On September 20, 2017, a hearing was held before Administrative Law Judge ("ALJ") Yasmin Elias. *Id.* at 21, 44–86. On March 14, 2018, the ALJ issued an unfavorable decision. AR at 18–37. On May 2, 2018, Plaintiff requested review of the ALJ's decision by the Appeals Council, and on February 25, 2019, review was denied. *Id.* at 1–5, 158. On March 21, 2019, Plaintiff filed this cause of action. Compl. (Doc. 1).

### B.    Factual History

Plaintiff was forty-one (41) years old at the time of the administrative hearing and thirty-four (34) at the time of the alleged onset of her disability. AR at 29, 35, 87, 99–100, 147, 150, 165, 172, 201, 234, 254. Plaintiff obtained a high school diploma and completed at least two (2) years of college. *Id.* at 29, 35, 60, 97, 99–101. Prior to her alleged disability, Plaintiff worked as a corrections officer and as a waitress and line cook. *Id.* at 29, 60–67, 69, 97, 206, 269.

#### 1.    Plaintiff's Testimony

##### a.    Administrative Hearing

At the administrative hearing, Plaintiff was unrepresented and was not prepared to take advantage of an adjournment. AR at 46–48. Plaintiff testified that she lived alone with her dog. *Id.* at 58. Plaintiff further testified that because she had been designated with a serious mental illness ("SMI") she receives assistance for mental and physical health

---

[1] Plaintiff submitted a typewritten list of 120 different illnesses and conditions with her application. AR 51–53, 748–56. The first page of Plaintiff's list is missing from the copy in the Administrative Record. *See id.* at 748–56.

and also receives food stamps.  *Id.* at 58–59.  Plaintiff also testified that her ex-husband pays her rent and other bills.  *Id.* at 58.  Plaintiff indicated that there might have been a short period of time where she did not have health insurance, but generally the people at COPE helped her navigate the system to receive necessary care.  *Id.* at 59.

Plaintiff confirmed that she has a driver's license but has to limit her driving due to the medications that she is on.  AR at 59–60.  Plaintiff also confirmed that she had completed two (2) years of college.  *Id.* at 60.  Plaintiff testified that she worked for the Department of Corrections for seven and a half years, ending in 2010.  *Id.*  Plaintiff explained that her work as a corrections officer ended because she "freaked out" and had a "psychotic break."  *Id.*  Plaintiff further testified that prior to becoming a corrections officer, she was a guard at the facility.  AR at 61–62.

Plaintiff also testified that prior to working at the Department of Corrections she worked as a waitress, and in that position, sometimes performed work as a line cook.  *Id.* at 62–64.  Plaintiff reported that one of her waitressing jobs was a Rick Griffin's, a truck stop in Willcox.  *Id.* at 63.  Plaintiff confirmed that she waitressed at Thunder Canyon Brewery.  *Id.* at 63–64.  Plaintiff estimated that she lifted five (5) to ten (10) pounds at a time as a waitress.  *Id.* at 65.  Plaintiff described emotional difficulty, particularly with authority figures, as a reason that she is unable to work.  AR at 65–66.  Plaintiff testified that her emotional issues, including hallucinations and delusions, resulted in poor decision making.  *Id.* at 66–67.  Plaintiff's description of her disabling conditions focused on her psychological issues and these were the primary reason for her leaving work, although Plaintiff acknowledged that physically she tired easily and had fibromyalgia.  *Id.* at 65–76.

ALJ Elias reviewed Plaintiff's medical records that were in the administrative record and Plaintiff testified that in addition to the records in the file, she received treatment from Dr. Michael Birgel, as well as a doctor in Safford, Arizona, whose name she could not remember.  *Id.* at 51–57.  ALJ Elias instructed Plaintiff to call her office with the names of any doctors that might have been missing so that the ALJ could subpoena the records.  *Id.* at 55, 57, 73, 76.  Plaintiff testified that she did not receive treatment between 2010 and

2015.  AR at 70–71.

## b. Administrative Forms

### i. *Function Report—Adult*

On February 7, 2016, Plaintiff completed a Function Report—Adult.  AR at 245–53.  Plaintiff reported that she lived alone in a trailer in a trailer park.  *Id.* at 245.  Plaintiff recounted her average day as including "wak[ing] up[,] . . . tak[ing] meds, drink[ing] enough coffee to wake up[,] try[ing] and walk[ing] dog[,] . . . most of day spent in bed tired unable to get going, sometimes do[ing] chores like vacuming[,] [sic] . . . shopping for grocieries [sic], [and] bipolar meetings [at] night [twice per week]."  *Id.* at 246.  Plaintiff described how her illnesses limit her ability to work as follows:

> Can't concentrate.  Unable to adhere/comply with work schedule hours required due to meds prescribed.  Issues w/bosses – they don't want my input, but very hard for me not to point out what they're doing wrong or how it could be done better, causes me a lot of conflict and trouble.  Often feel I could do better so I go out on my own instead of following directions.

*Id.* at 245.  Plaintiff reported that she cares for her dog, Daisy, feeding and watering her daily, as well as trying to walk her daily.  *Id.* at 246.  Plaintiff noted that someone else watches Daisy occasionally and may take her to the dog park.  AR at 246.

Plaintiff indicated that prior to her illness she was able to "get up on time, concentrate for extended periods of time, [and] manage to work."  *Id.*  Plaintiff reported that her illnesses make it "hard to get up 'on time' with the rest of the world, [she] tire[s] very easily, . . . [she] sleep[s] a lot, [is] tired all the time, [and] [is] dependent on the meds to sleep at all[.]"  *Id.*  Plaintiff further reported that she is able to perform self-care, but is not always able to remember or motivate herself to do so. *Id.* at 247.  Plaintiff indicated that she has issues with Irritable Bowel Syndrome ("IBS") and constipation.  AR at 247.  Plaintiff noted that she only prepares "quick and easy" foods, such as microwave meals or ramen noodles.  *Id.*  Plaintiff also reported that she does not do any outdoor chores, but has a neighbor who helps her.  *Id.* at 248.  Plaintiff noted that she is sometimes able to vacuum, run the dishwasher, and do laundry, but "everything is exhausting [and she does tasks] only

- 4 -

as absolutely needed." *Id.* Plaintiff reiterated that she tries to take Daisy out for walks daily, but she is hindered by exhaustion and panic attacks. *Id.*

Plaintiff reported being able to walk, as well as drive or ride in a car, and can do so unaccompanied. AR at 248. Plaintiff further reported that she is able to shop in stores for food, medicine and pet supplies. *Id.* Plaintiff indicated that her ex-husband pays all of the bills, so she has not had to learn money management. *Id.* at 249. Plaintiff reported that she does not have any hobbies or interests besides Daisy, her dog. *Id.* Plaintiff further reported that she watches television "to try and calm down[,]" and generally derives much less enjoyment from activities. *Id.* Plaintiff noted that she tries to talk to her neighbors and attend a Bi-polar support group regularly for socialization, and she occasionally attends Bingo. AR at 249. Plaintiff does not have any family contact. *Id.* at 250.

Plaintiff reported that her conditions affect her ability to lift, walk, sit, remember, complete tasks, concentrate, understand, follow instructions, and get along with others. *Id.* Plaintiff listed Fibromyalgia as affecting her activities, and along with her medications, compounds her exhaustion. *Id.* Plaintiff further reported being able to walk "a block or so" before needing to rest, and not being able to walk, sit, or stand for long periods because she gets leg cramps. *Id.* Plaintiff also reported that she has trouble concentrating and following instructions, both written and spoken. AR at 250. Plaintiff described her ability to get along with authority figures, handle stress, and handle changes in routine as poor. *Id.* at 251. Plaintiff also noted that she usually quit jobs before she was fired, but had been fired from Coffee Etc. and banned by the Arizona Department of Corrections. *Id.* Plaintiff did not list using corrective or assistive devices other than glasses and medication. *Id.* Plaintiff's listed medications included Seroquel, Prozac, Hydroxine, Cyclobenzaloprine, and Naltrexone.[2] *Id.* at 252.

### ii.   *Work Background*

Plaintiff provided her work background consisting of her work at the Arizona

---

[2] The medications are reproduced here as printed on the form. The Court is unsure of the accuracy of "Hydroxine" and "Cyclobenzaloprine."

Department of Corrections from May 2003 to November 2010.  AR at 269.  Prior to May 2003, Plaintiff listed "varied" and noted that she had eighteen (18) different jobs during this period.  *Id.*

## 2.  Plaintiff's Medical Records

### a.  Treatment records[3]

On September 14, 2004, Plaintiff was seen by  Lynn E. Smith, M.D. at Mt. Graham Family Practice for an initial consultation.  AR at 851.  On September 22, 2004, Plaintiff returned to Dr. Smith.  *Id.*  Dr. Smith's physical examination was unremarkable, but noted Plaintiff's depression and anxiety.  *Id.*  On September 30, 2004, Plaintiff saw Dr. Smith for a follow-up.  *Id.* at 852.  Dr. Smith noted that Plaintiff's "labs were almost perfect."  *Id.*  On October 26, 2004, Plaintiff saw Dr. Smith and reported that she felt "she [wa]s doing better on the PAXIL 12.5 mg."  AR at 852.  On January 13, 2005, Plaintiff saw Dr. Smith for a follow-up regarding her depression and anxiety.  *Id.* at 853.  Plaintiff reported that "[s]he [wa]s pleased how things [we]re going."  *Id.*  On February 9, 2005, Plaintiff returned to Dr. Smith with severe depression and "want[ing] to get off the PAXIL."  *Id.*  On April 21, 2005, Plaintiff was seen by Dr. Smith regarding her birth control pills.  *Id.* at 854.  Dr. Smith noted that Plaintiff seemed to be doing better psychologically.  AR at 854.  On June 13, 2005, Plaintiff returned to Dr. Smith for a follow-up visit.  *Id.*  Plaintiff complained of irregular bleeding with her birth control pills and an ear infection.  *Id.*  On July 28, 2005, Plaintiff was seen at Mt. Graham Family Practice regarding her clinical diagnostic laboratory results.  *Id.* at 855.  On October 3, 2005, Plaintiff was seen by Dr. Smith for a follow-up regarding her birth control pills.  *Id.* at 856.  Dr. Smith's physical examination was unremarkable.  AR at 856.

On January 16, 2006, Plaintiff was seen by Carolyn Jo McCormies, R.N., M.S., F.N.P.-B.C. at Mt. Graham Family Practice for a follow-up regarding her birth control pills.  *Id.* at 856–57.  NP McCormies' examination of Plaintiff was unremarkable.  *Id.* at 857.  On

---

[3] The Court has reviewed the entirety of Plaintiff's medical records; however, due to Plaintiff's challenge regarding the ALJ's assessment of Dr. Chen's opinion, the Court has generally limited its summary to those records involving Plaintiff's physical complaints.

October 19, 2007, Plaintiff was seen by Bradford N. Montierth, M.D. for an allergic reaction to lotion. *Id.* at 857. On February 3, 2009, Plaintiff was seen by Ken Larson, PA-C at Mt. Graham Family Practice for her well woman examination. *Id.* at 858. PA Larson's examination of Plaintiff was unremarkable. AR at 858. On February 11, 2009 Plaintiff saw PA Larson for a "follow-up on her chronic cough." *Id.* at 859. Plaintiff's "chest x-ray was normal[,]" as were her labs, and PA Larson's physical examination was unremarkable. *Id.* On April 3, 2009, Plaintiff was seen by Dr. Smith for a sore throat. *Id.*

On October 3, 2013, Plaintiff saw Michael A. Birgel, M.D. for an initial visit. *Id.* at 709–10. Plaintiff indicated that she had not been seen by a physician in approximately ten (10) years. AR at 709. Dr. Birgel noted that Plaintiff "present[ed] with a long standing history of multiple complaints which [we]re outlined in the full page that she ha[d] typed up for our benefit." *Id.* Dr. Birgel's examination was unremarkable, and his assessment included generalized pain, headache, blurry vision, urinary symptoms, knee joint pain, memory lapses or loss, insomnia, possible irritable bowel syndrome, dyspareunia, and fatigue. *Id.* at 709–10.

On February 17, 2014, Plaintiff returned to Dr. Birgel for a follow-up visit. *Id.* at 705–08. Dr. Birgel noted that "[i]n summary, she had the generalized pains, multiple arthralgias and a myriad of symptoms that led to a comprehensive work up and as below these tests were quite unrevealing." *Id.* at 705. Dr. Birgel further noted that tests showed "[n]o evidence for inflammatory disease, autoimmune process, rheumatoid arthritis or anything else." *Id.* Dr. Birgel also indicated that the "x-rays that were done were [also] negative." AR at 705. Plaintiff told Dr. Birgel that "Dr. Posadas said that he would not treat any kind of fibromyalgia and that was left up to [Dr. Birgel]." *Id.* Dr. Birgel noted that "[i]n fact, she brings a pilot report from a study done at Stanford using naltrexone that showed improvement in patients with fibromyalgia, a study done on only ten patients[,] [and which] . . . is not FDA approved for this purpose." *Id.* Dr. Birgel informed Plaintiff that he "would not be willing to prescribe this although she seems like she really wants to go in this direction and the best we can do is have her get a second opinion." *Id.* Dr. Birgel

1   confirmed that Plaintiff had mild obstructive sleep apnea.  AR at 705  Plaintiff declined all

2   treatment options suggested by Dr. Birgel.  *Id.*  Dr. Birgel's examination and Plaintiff's

3   laboratory results were unremarkable.  *Id.* at 705–08.

4          On December 10, 2014, Plaintiff went to the Tucson Medical Center Emergency

5   Department complaining of right upper quadrant abdominal and epigastric pain after

6   beginning a ketogenic diet.  *Id.* at 310, 313, 333, 336.  Plaintiff underwent an emergency

7   laparoscopic cholecystectomy that same day and was discharged the following day.  *Id.*

8   309–65.  On December 18, 2014, Plaintiff saw Dr. Birgel for a follow-up appointment.  AR

9   at 700–04.  Plaintiff reported feeling nauseated, dizzy, sweaty, having a poor appetite,

10  watery bowel movements, swelling in her ankles, feeling stressed and anxious, being afraid

11  to sleep, and feeling shaky.  *Id.* at 700.  Dr. Birgel's physical examination of Plaintiff was

12  unremarkable; however, he noted that she appeared quite anxious.  *Id.* at 703.  On

13  December 24, 2014, Plaintiff again saw Dr. Birgel seeking a refill of her Vicodin

14  prescription.  *Id.* at 696–699.  Dr. Birgel's examination was generally unremarkable, and

15  he refilled her prescriptions as her surgery follow-up was scheduled for early January.  *See*

16  *id.*  On December 26, 2014, Plaintiff had an ultrasound of her abdomen which was

17  unremarkable except for possible fatty change to her liver.  AR at 656, 681, 693.

18         On January 5, 2015, Plaintiff was seen for an initial consultation by Elias D.

19  Stratigouleas, M.D. at Tucson ENT Associates.  *Id.* at 592–96.  Dr. Stratigouleas performed

20  a nasal endoscopy and noted hypertrophy of the nasal turbinates and a deviated nasal

21  septum.  *Id.* at 595.  On January 7, 2015, Plaintiff saw Anis Hanna, M.D. regarding

22  esophageal reflux with nausea and long standing constipation.  *Id.* at 688–89.  Dr. Hanna

23  assessed esophageal reflux and Irritable Bowel Syndrome ("IBS").  *Id.* at 688.  On January

24  9, 2015, Plaintiff was seen at Arthritis Associates regarding her generalized pain and

25  fatigue, as well as for a follow up on her laboratory results.  AR at 787–89.  Plaintiff

26  reported having fibromyalgia with symptoms that began three (3) to four (4) years prior.

27  *Id.* at 787.  On January 12, 2015, Plaintiff saw Dr. Birgel.  *Id.* at 693–95, 747.  Dr. Birgel's

28  physical examination of Plaintiff was unremarkable, and his assessment included

abdominal pain, a history of abnormal liver enzymes, and a fatty liver.  *Id.* at 695.  On January 13, 2015, Plaintiff underwent a colonoscopy which showed diverticulosis in the sigmoid colon, but was otherwise unremarkable.  *Id.* at 682–83.  Plaintiff underwent an upper GI endoscopy on the same date.  AR at 684–85.  Biopsies were taken of a Z-line and gastric mucosal abnormality, and a hiatus hernia was noted.  *Id.*  The biopsies did not show histomorphologic abnormality.  *Id.* at 686.  On January 19, 2015, Plaintiff returned to Dr. Birgel for a comprehensive physical examination.  *Id.* at 742–46.  Dr. Birgel noted that he "[r]eviewed her comprehensive labs workup [and] even sprue panel is negative."  *Id.* at 742.  Dr. Birgel's physical examination was unremarkable.  AR at 745–46.  On January 23, 2015, Plaintiff had a computerized tomography ("CT") scan of her abdomen due to abdominal pain.  *Id.* at 677–80, 737–39.  K.J. Tertel, M.D. noted an uncomplicated cholecystectomy with minor central intrahepatic biliary ductal dilatation, unremarkable pancreas, multiple bilobar simple intrahepatic cysts, a solitary simple right renal cortical cyst, and otherwise unremarkable abdomen.  *Id.* at 677, 679.  On January 28, 2015, Plaintiff underwent a septoplasty and inferior turbinate resection.  *Id.* at 589–91.  The surgery was unremarkable.  *Id.* at 590.

On February 3, 2015, Plaintiff saw Dr. Stratigouleas for a follow-up regarding her nasoseptal reconstruction and turbinate reduction surgery.  AR at 585–88.  The examination was unremarkable and no complications were noted.  *Id.* at 587.  On February 27, 2015, Plaintiff was seen by Sujata Sarkar, M.D. at ACP–Arthritis Associates.  *Id.* at 784–86.  Dr. Sarkar's impression included "generalized pain with fatigue with positive ANA and equivocal anti-dsDNA."  *Id.* at 786.  Dr. Sarkar noted that "[a] VISE CTD [was] not suggestive of lupus[,] anti-ds DNA negative by Cithidia[,] [and] [t]he abnormal serologies may suggest an immune disturbance."  *Id.*  Dr. Sarkar also noted that Plaintiff "want[ed] to see Dr. Cabin and Jeffrey Penniston."  AR at 785.

On March 3, 2015, Plaintiff saw Brian L. Cabin, M.D.(H)P.C. for chronic pain.  *Id.* at 770–71.  Plaintiff reported "severe whole body, symmetric pain while attempting to learn Tai Chi (mild exercise)" with an onset two and a half (2 1/2) to three (3) years prior.  *Id.* at

771.  Plaintiff further reported that she had researched LDN online.  *Id.* at 770.  On March 5, 2015, Plaintiff saw Dr. Birgel regarding "bug bites" on her neck and an update on specialists.  *Id.* at 736–40.  Plaintiff reported having electrolysis on her chin and neck prior to the onset of the "bug bites" and did not see any actual bugs.  AR at 736.  Dr. Birgel's physical examination of Plaintiff was unremarkable, but noted "some raised red welts on the anterior neck just above the larynx associated with a few small pustules."  *Id.* at 740.  Dr. Birgel also noted that Plaintiff reported walking for exercise, and that she was unemployed but not looking for work.  *Id.* at 737.  On March 10, 2015, Plaintiff followed up with Dr. Stratigouleas.  *Id.* at 581–84.  Dr. Stratigouleas's examination was unremarkable.  *See id.*  On March 11, 2015, Plaintiff returned to Dr. Birgel reporting numbness in her right thumb and "sore right ribs after overzealous intimacy recently, with persistent pain."  AR at 732.  Dr. Birgel's physical examination of Plaintiff was unremarkable, but he ordered a nerve conduction study, as well as x-rays.  *Id.* at 735.  On March 22, 2015, Plaintiff was seen at the Tucson Medical Center Emergency Department for upper abdominal pain in the same area as prior to her emergency cholecystectomy.  *Id.* at 366–81.  A CT scan indicated an ovarian cyst, mild diverticulosis, and "low attn hepatic foci[.]"  *Id.* at 373, 380–81.  Plaintiff was treated for a urinary tract infection ("UTI") and ovarian cyst.  *Id.* at 373.

On April 2, 2015, Plaintiff's husband called Dr. Birgel's office and reported that Plaintiff "had a psychic break [and] . . . [wa]s in a crisis center."  AR at 731.  On April 13, 2015, Plaintiff was seen by Dr. Birgel for a follow-up after her hospitalization.  *Id.* at 728–30.  Dr. Birgel noted that Plaintiff received inpatient mental health management at Banner between April 4 and was discharged April 8.  *Id.* at 728.  Dr. Birgel noted that Plaintiff "saw Dr. Cabin for fibromyalgia who put her on naltrexone 1.5 mg at bedtime."  *Id.*  Dr. Birgel further noted that he could provide "a one-month prescription refill on current treatment program pending [Plaintiff's] establishing with psychiatry for further management as soon as possible[,]" but directed her to "followup [sic] with Dr. Cabin re: naltrexone prescription."  *Id.* at 730.  On April 20, 2015, Plaintiff followed up with Dr.

Cabin.  AR at 768.  Dr. Cabin noted her bipolar disorder and fibromyalgia.  *Id.*  On April 29, 2015 saw Dr. Sarkar for a follow up visit.  *Id.* at 781–83.  Plaintiff did not report any new symptoms since her last visit.  *Id.* at 783.  Dr. Sarkar noted that Plaintiff had been seen by Dr. Cabin, as well as her recent mental breakdown.  *Id.*

On May 1, 2015, Plaintiff was determined to have a Serious Mental Illness ("SMI"). AR at 280.  On May 5, 2015, Plaintiff followed up with Dr. Stratigouleas regarding her septoplasty and inferior turbinate resection.  *Id.* at 577–80.  Dr. Stratigouleas's examination was unremarkable.  *See id.*  An undated record from COPE Community Services reflects that Plaintiff reported constipation due to her medication and that she was taking Naltrexone for her fibromyalgia.[4]  *Id.* at 608, 610.  On May 18, 2015, Plaintiff was seen by Dr. Birgel for sexually transmitted disease screening.  *Id.* at 721–27.  Dr. Birgel's examination was unremarkable.  *See* AR at 721–27.  On May 19, 2015, Plaintiff saw Dr. Cabin, who noted her fibromyalgia was much improved.  *Id.* at 767.

On June 24, 2015, Plaintiff was seen by Dr. Sarkar.  *Id.* at 778–80.  Dr. Sarkar's review was unremarkable.  *See id.*  On July 6, 2015, Plaintiff saw Dr. Birgel regarding digestion problems.  *Id.* at 718–21.  Plaintiff reported left upper quadrant abdominal pains radiating to the mid abdomen after eating vegetables, as well as frequent watery or loose stools.  AR at 718.  Dr. Birgel's physical examination was unremarkable.  *Id.* at 720.  On July 22, 2015, Plaintiff underwent an abdominal CT scan.  *Id.* at 675–76, 712–15.  Wayne Vose, M.D. interpreted Plaintiff's scans and compared them to her March 22, 2015 scans. *Id.*  Dr. Vose's findings were consistent with the prior scans and generally unremarkable. *Id.*

On August 20, 2015, Plaintiff returned to Dr. Cabin.  AR at 769.  Plaintiff reported that her weight was down then she had GI problems.  *Id.*  Dr. Cabin also noted reduced pain resulted in better sleep.  *Id.*  On September 16, 2015, Plaintiff saw Dr. Birgel regarding questions about disability.  *Id.* at 711–17.  Dr. Birgel noted that Plaintiff "br[ought] some old records from a doctor in Safford, reflecting mainly GYN care."  *Id.* at 711.  Plaintiff

---

[4] The Court believes this record is from May 2015.

indicated that she wanted Dr. Birgel to "give her a disability statement regarding her psychiatric disability[.]"  AR at 711.  Dr. Birgel declined noting that this "need[ed] to be handled by psychiatry[.]"  *Id.*  On September 22, 2015, Plaintiff saw Dr. Cabin who noted that she was applying for disability.  *Id.* at 766.

On December 8, 2015, Plaintiff saw Dr. Cabin who noted that she was "[d]enied for disability round 1" and made a note of Bryan Clymer.  *Id.* at 765.  Dr. Cabin further noted that Plaintiff's fibromyalgia was controlled.  *Id.*  On December 15, 2015, Plaintiff returned to Dr. Cabin regarding her disability application.  AR at 764.  On December 16, 2015, Plaintiff saw Dr. Sarkar for a follow up.  *Id.* at 776-77.  Plaintiff reported having more joint symptoms, including chills and fatigue.  *Id.* at 777.  Dr. Sarkar's review was otherwise unremarkable.  *See id.* at 776–77.

On July 19, 2017, Chantelle Chen, M.D. completed a Physical Medical Source Statement regarding Plaintiff.  *Id.* at 291–94.  Dr. Chen reported diagnoses including Bipolar disorder, chronic abdominal pain, and Irritable Bowel Syndrome ("IBS").  AR at 291.  Dr. Chen indicated that Plaintiff's prognosis was good.  *Id.*  Dr. Chen further reported that Plaintiff's symptoms included intermittent abdominal pain and cramping, as well as intermittent constipation and diarrhea.  *Id.*  Dr. Chen noted that these impairments lasted or could be expected to last for more than twelve (12) months and that emotional factors, including anxiety and Bipolar disorder, contributed to their severity.  *Id.* at 291–92.  Dr. Chen opined that Plaintiff could walk two (2) city blocks without rest or severe pain; sit for an hour at a time; stand for more than two (2) hours at a time; sit for approximately two (2) hours in an eight (8) hour work day; and stand/walk for approximately four (4) hours in an eight (8) hour work day.  *Id.* at 292.  Dr. Chen further opined that Plaintiff did not need a job that allowed shifting positions at will or that included periods of walking during an eight (8) hour work day.  AR at 292.  Dr. Chen also opined that Plaintiff would need to take unscheduled breaks, estimating that these would occur twice per day and last fifteen (15) minutes.  *Id.*  Dr. Chen noted that Plaintiff's abdominal pain and IBS would cause the need for these additional breaks to use the restroom.  *Id.*  Dr. Chen indicated that Plaintiff

would not require her legs to be elevated or an assistive device for walking and standing. *Id.* at 293.  Dr. Chen opined that Plaintiff could frequently lift ten (10) pounds, but rarely lift twenty (20) to fifty (50) pounds.  *Id.*  Dr. Chen further opined that Plaintiff could frequently twist, stoop (bend), crouch/squat, climb stairs, and climb ladders, and did not have any significant limitations with reaching, handling, or fingering.  AR at 293.  Dr. Chen reported that Plaintiff would likely be off task for ten (10) percent of a typical work day.  *Id.* at 294.  Dr. Chen also indicated that Plaintiff would be capable of tolerating moderate stress or normal work.  *Id.*  Dr. Chen opined that Plaintiff's impairments would likely produce good days and bad days, and that she would likely be absent from work approximately four (4) days per month.  *Id.*  Dr. Chen noted that the earliest date the questionnaire applied to was October 2016.  *Id.*

On August 23, 2017, Kathleen Oldfather, P.M.H.N.P., B.C. submitted a Mental Impairment Questionnaire on behalf of Plaintiff.  AR at 275–77.  NP Oldfather indicated that Plaintiff initially saw her monthly, later transitioning to quarterly appointments.  *Id.* at 275.  NP Oldfather listed Plaintiff's medications as including Prozac, Quetiapine, and Hydroxyzine Pamoate.  *Id.*  NP Oldfather opined that based on Plaintiff's history of hospitalization with psychiatric symptoms, she would anticipate that Plaintiff would be "unable to perform in a work setting should she experience symptom recurrence."  *Id.* at 277.

### b.  Reviewing physicians

#### i.  *Robert S. Hirsch, M.D.*

On November 9, 2015, Robert S. Hirsch, M.D. reviewed Plaintiff's medical records for the initial determination.  AR at 25, 92–94, 98.  Dr. Hirsch noted that Plaintiff's abdominal CT scan was "stable[,] showing no sig[nificant] abnormalities[,]" her laboratory findings were within normal limits, and other examinations "reveal[ed] no somatic functional problems."  *Id.* at 92.  Dr. Hirsch opined that "objective findings do not document impairments that would preclude all [substantial gainful activity.]"  *Id.* at 94.  Dr. Hirsch further opined that Plaintiff did not have any somatic medically determinable

1    impairment.  *Id.* at 97.

2                         ***ii.  Raymond Novak, M.D.***

3         On November 6, 2015, Raymond Novak, M.D. also reviewed Plaintiff's medical

4    records for the initial determination.  AR at 34, 93–94.  Dr. Novak opined that Plaintiff's

5    impairment of affective disorders was severe.  *Id.* at 93.  Dr. Novak further opined that

6    Plaintiff's affective disorder caused a mild restriction of her activities of daily living;

7    moderate difficulty in her maintenance of social functioning; and moderate difficulty in

8    her maintenance of concentration, persistence, or pace.  *Id.*  Dr. Novak also opined that the

9    "[e]vidence d[id] not establish the presence of the 'C' criteria."  *Id.*  Dr. Novak noted that

10   Plaintiff was moderately limited in her ability to understand and remember detailed

11   instructions; to carry out detailed instructions; to maintain attention and concentration for

12   extended periods; to work in coordination with or in proximity to others without being

13   distracted by them; to complete a normal workday and workweek without interruptions

14   from psychologically based symptoms and to perform at a consistent pace without an

15   unreasonable number and length of rest periods; to accept instructions and respond

16   appropriately to criticism from supervisors; to get along with coworkers or peers without

17   distracting them or exhibiting behavioral extremes; and had limitations on social

18   interactions.  *Id.* at 95–96.  Dr. Novak opined that Plaintiff was not significantly limited in

19   any other area, and she was able to meet the basic mental requirements for substantial

20   gainful activity.  *Id.* at 96.

21              **3.  <u>Vocational Expert Ronald Joseph Fleck's Testimony</u>**

22        Mr. Ronald Fleck testified as a vocational expert at the administrative hearing.  AR

23   at 21, 77–81.  The ALJ asked Mr. Fleck to classify Plaintiff's past work.  *Id.* at 78.  Mr.

24   Fleck classified Plaintiff's past relevant work as a corrections officer, Dictionary of

25   Occupational Titles ("DOT") number 372.667-018, medium exertional level, semi-skilled,

26   and a Specific vocational Preparation ("SVP") of 4.  *Id.* at 78.  Mr. Fleck described

27   Plaintiff's work as a waitress, as DOT number 311.477-026, with an SVP of 4, semi-

28   skilled, and light exertional level.  *Id.*

The ALJ asked Mr. Fleck to consider a hypothetical individual, the same age as Plaintiff, with an education including high school or above, and the same work history as Plaintiff. *Id.* at 78–79. The ALJ described the individual to be a person that could meet the basic demands of simple routine tasks, and requiring an environment with only occasional interaction with the public and co-workers. AR at 79. The ALJ sought information without exertional limitations, as well as at medium and light levels. *Id.* Mr. Fleck opined that such an individual would not be able to perform any of Plaintiff's past work. *Id.* Mr. Fleck further opined that there would be other jobs available in the national economy that such a person could perform, including a cleaner such as one that works with airlines or a loan carrier subservice, DOT number 919.687-014, with an SVP of 1, unskilled, medium exertional level, and 5,700 jobs in the national economy. *Id.* Mr. Fleck also suggested that the hypothetical individual could work as a janitor, DOT number 382.664-010, with an SVP of 3, semi-skilled, medium exertional level, and in excess of 100,000 jobs in the United States. *Id.* at 80. Mr. Fleck's third work suggestion was a cleaner in housekeeping, DOT number 323.687-014, with an SVP of 2, unskilled, light exertional level, with approximately 20,000 jobs in the national economy. AR at 80.

The ALJ inquired regarding an employer's tolerance for an individual to be off task for part of the day. *Id.* Mr. Fleck testified that in his professional experience, an individual who is off task or missing work 11% of the time or more, such an individual would not be able to maintain competitive employment in any occupation. *Id.* Mr. Fleck further testified that this also holds true with absenteeism, calculating that three (3) or more absences a month would prevent maintenance of competitive employment. *Id.* at 80–81. Mr. Fleck reiterated that his response that did not rely directly upon the DOT were based upon his personal, professional experience. *Id.* at 81.

### 4.  Lay Witness Testimony

#### a.  Cheryl Cooper

On October 17, 2015, Cheryl Cooper, Plaintiff's friend, completed a Function Report—Adult—Third Party. AR at 218–25. Ms. Cooper reported that Plaintiff lived in

a house with family.  *Id.* at 218.  Ms. Cooper further reported that she did not spend much time with Plaintiff, but that they went to Bingo occasionally and she sometimes took Plaintiff to appointments.  *Id.*  Ms. Cooper did not offer much information about Plaintiff, but noted that Plaintiff cared for her dog with help from Plaintiff's husband.  *Id.* at 219, 221.  Ms. Cooper also noted Plaintiff's hobbies as including reading, watching television, and attending Bingo if Ms. Cooper invited her.  *Id.* at 222, 224.  Ms. Cooper opined that Plaintiff seemed isolated and noted that she would lose her train of thought during Bingo. AR at 223.

### b.  Robert Schneider

On February 6, 2016, Robert Schneider, Plaintiff's ex-husband, completed a Function Report—Adult—Third Party.  AR at 237–44.  Mr. Schneider reported that he had known Plaintiff for fifteen (15) years and she lived alone in a trailer.  *Id.* at 237.  Mr. Schneider described Plaintiff's day as including excessive sleep due to her medication, but she would manage to walk the dog and feed herself.  *Id.* at 237–38.  Mr. Schneider noted that Plaintiff's neighbor sometimes helped her with her dog.  *Id.* at 238.  Mr. Schneider reported that Plaintiff was able to perform personal care; however, she did not due to her depression.  *Id.* at 238–39.  Mr. Schneider further reported that Plaintiff was limited to easily prepared meals and would sometimes eat at his house.  AR at 239.  Mr. Schneider noted that Plaintiff's exhaustion limits her ability to perform chores.  *Id.* at 239–40.

Mr. Schneider indicated that Plaintiff is able to go out daily, on her own, and can walk, drive, and ride in a car.  *Id.* at 240.  Mr. Schneider reported that Plaintiff is able to shop in stores and goes for groceries twice per week.  *Id.*  Mr. Schneider further reported that he pays her bills.  *Id.*  Mr. Schneider listed Plaintiff's hobbies and interests to include watching television, walking her dog, attending her Bi-polar support group, and occasional Bingo.  AR at 241.  Mr. Schneider noted that Plaintiff's conditions affect her ability to concentrate and complete tasks, and exhaustion generally limits her activities.  *Id.* at 242. Mr. Schneider also noted that Plaintiff has difficulty following written, as well as spoken instructions, and has difficulty getting along with authority figures.  *Id.* at 242–43.  Mr.

Schneider observed that Plaintiff reaches her breaking point and quits jobs before she can be fired. *Id.* at 243. Mr. Schneider further observed that Plaintiff suffered panic attacks, delusions, hallucinations, occasionally heard voices, and was paranoid about authority. *Id.* Mr. Schneider noted that Plaintiff wears glasses. AR at 243.

## II.    STANDARD OF REVIEW

The factual findings of the Commissioner shall be conclusive so long as they are based upon substantial evidence and there is no legal error. 42 U.S.C. §§ 405(g), 1383(c)(3); *Tommasetti v. Astrue*, 533 F.3d 1035, 1038 (9th Cir. 2008). This Court may "set aside the Commissioner's denial of disability insurance benefits when the ALJ's findings are based on legal error or are not supported by substantial evidence in the record as a whole." *Tackett v. Apfel*, 180 F.3d 1094, 1097 (9th Cir. 1999) (citations omitted); *see also Treichler v. Comm'r of Soc. Sec. Admin.*, 775 F.3d 1090, 1098 (9th Cir. 2014).

Substantial evidence is "'more than a mere scintilla[,] but not necessarily a preponderance.'" *Tommasetti*, 533 F.3d at 1038 (quoting *Connett v. Barnhart*, 340 F.3d 871, 873 (9th Cir. 2003)); *see also Garrison v. Colvin*, 759 F.3d 995, 1009 (9th Cir. 2014). Further, substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Parra v. Astrue*, 481 F.3d 742, 746 (9th Cir. 2007). Where "the evidence can support either outcome, the court may not substitute its judgment for that of the ALJ." *Tackett*, 180 F.3d at 1098 (citing *Matney v. Sullivan*, 981 F.2d 1016, 1019 (9th Cir. 1992)); *see also Massachi v. Astrue*, 486 F.3d 1149, 1152 (9th Cir. 2007). Moreover, the court may not focus on an isolated piece of supporting evidence, rather it must consider the entirety of the record weighing both evidence that supports as well as that which detracts from the Secretary's conclusion. *Tackett*, 180 F.3d at 1098 (citations omitted).

. . .

. . .

. . .

## III.   ANALYSIS

### A.   *The Five-Step Evaluation*

The Commissioner follows a five-step sequential evaluation process to assess whether a claimant is disabled.  20 C.F.R. § 404.1520(a)(4).  This process is defined as follows:  Step one asks is the claimant "doing substantial gainful activity[?]"  If yes, the claimant is not disabled; step two considers if the claimant has a "severe medically determinable physical or mental impairment[.]"  If not, the claimant is not disabled; step three determines whether the claimant's impairments or combination thereof meet or equal an impairment listed in 20 C.F.R. Pt. 404, Subpt. P, App.1.  If not, the claimant is not disabled; step four considers the claimant's residual functional capacity and past relevant work.  If claimant can still do past relevant work, then he or she is not disabled; step five assesses the claimant's residual functional capacity, age, education, and work experience.  If it is determined that the claimant can make an adjust6ment to other work, then he or she is not disabled.  20 C.F.R. § 404.1520(a)(4)(i)-(v).

In the instant case, the ALJ found that Plaintiff had "not engaged in substantial gainful activity since November 30, 2010, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).  AR at 23.  At step two of the sequential evaluation, the ALJ found that "[t]he claimant has the following severe impairments: Psychotic Disorder with Delusion; Post-Traumatic Stress Disorder; Anxiety Disorder (20 CFR 404.1520(c) and 416.920(c))."  *Id.* at 24.  The ALJ further found that "[t]he claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926)."  *Id.* at 25.  Prior to step four and "[a]fter careful consideration of the entire record," the ALJ determined that "the claimant has the residual functional capacity to perform a full range of  work at all exertional levels but with the following non-exertional limitations: the claimant could meet the basic requirement of simple routine tasks in a setting with minimal social demands[;] [a] setting of minimal social demands was defined as an environment with only occasional

interaction with the public and co-workers." *Id.* at 29.  At step four, the ALJ found that "[t]he claimant is unable to perform past relevant work (20 CFR 404.1565 and 416.965)." AR at 35.  At step five, the ALJ found that after "[c]onsidering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a))." *Id.*  Accordingly, the ALJ determined that Plaintiff was not disabled. *Id.* at 36.

Plaintiff asserts that the ALJ committed error by failing to fully and fairly develop the record and obtain updated records. *See* Opening Br. (Doc. 16).  Plaintiff further asserts that the ALJ erred in failing to properly weigh the opinion of treating physician, Chantelle Chen, M.D. *See id*.

### B.      Development of the Record

Plaintiff asserts that because "[t]he ALJ noted that 'The treatment records do not support severe physical impairments as <u>they are not properly documented</u>, lacked treatment or did not meet the durational requirements of a severe impairment[,] . . . [t]he ALJ erred by not following up on that treatment in obtaining updated records."  Pl.'s Opening Br. (Doc. 16) at 8 (quoting AR at 25) (emphasis in original).  Plaintiff relies on *Pope v. Comm'r of Soc. Sec. Admin.*, No. CV-17-394-TUC-LAB, 2018 WL 2057635 (D. Ariz. May 3, 2018) arguing that it was based on similar facts and to assert that remand is proper.  Pl.'s Reply (Doc. 20) at 2.

"The ALJ always has a 'special duty to fully and fairly develop the record and to assure that the claimant's interests are considered . . . even when the claimant is represented by counsel.'"  *Celaya v. Halter*, 332 F.3d 1177, 1183 (9th Cir. 2003) (quoting *Brown v. Heckler*, 713 F.2d 441, 443 (9th Cir. 1983)).  "When the claimant is unrepresented, however, the ALJ must be especially diligent in exploring for all the relevant facts."  *Tonapetyan v. Halter*, 242 F.3d 1144, 1150 (9th Cir. 2001) (citing *Cox v. Califano*, 587 F.2d 988, 991 (9th Cir. 1978)).  "Ambiguous evidence or the ALJ's own finding that the record is inadequate to allow for proper evaluation of the evidence, triggers the ALJ's duty

to 'conduct an appropriate inquiry.'" *Tonapetyan*, 242 F.3d at 1150 (quoting *Smolen v. Chater*, 80 F.3d 1273, 1288 (9th Cir. 1996); then citing *Armstrong v. Comm'r of Soc. Sec. Admin.*, 160 F.3d 587, 590 (9th Cir. 1998)). "The ALJ may discharge this duty in several ways, including: subpoenaing the claimant's physicians, submitting questions to the claimant's physicians, continuing the hearing, or keeping the record open after the hearing to allow supplementation of the record." *Tonapetyan*, 242 F.3d at 1150 (citations omitted). In *Pope*, the plaintiff "supported her disability claim by submitting a medical source statement apparently authored by her treating physician, Bera[,] [but] . . . the statement [wa]s incomplete." *Pope*, 2018 WL 2057635, at * 5. "The statement indicate[d] that it [wa]s four pages long, but only pages one and two appear[ed] in the record." *Id.* Because the ALJ recognized that the statement was incomplete, as well as ambiguous, the *Pope* court found that the ALJ failed to "fully and fairly develop the record by obtaining the missing information." *Id.* The *Pope* court remanded the matter to allow the ALJ to supplement the record and reevaluate her decision. *Id.* at 5–6.

Here, during the administrative hearing, the ALJ acknowledged her "duty to assist [Plaintiff] in obtaining records . . . to try to help support [her] case." *See* AR at 47. During the administrative hearing, the ALJ also went through the medical records contained in the file with Plaintiff. *Id.* at 50–57. The ALJ asked Plaintiff if she had additional treatment and from whom. *Id.* at 55–57. Ultimately, the ALJ determined that she would keep the record open for twenty (20) days and instructed Plaintiff that once she was back home, she should try to remember any other places that she might have received treatment from November 2010 forward and contact the ALJ's office so that the ALJ could try and obtain the records. *Id.* at 74. Plaintiff did not provide the ALJ with any additional information.

Unlike *Pope*, Dr. Chen's medical source statement is complete—there are no pages missing. *See id.* at 291–94. Furthermore, the ALJ held the record open to provide Plaintiff the opportunity to provide the names of any treatment providers that she may have seen. Plaintiff states that "[p]rior to the hearing, Ms. Schneider identified Dr. Cabin, Dr. McCullum at Tucson Gastroenterology, Dr. Chen at Marana Healthcare, and NP Oldfather

at COPE as doctors with updated treatment records."  Pl.'s Opening Br. (Doc. 16) at 8 (citing AR at 271).  Plaintiff also asserts that "[o]f these, the only provider the ALJ obtained updated records from was COPE."  Pl.'s Opening Br. (Doc. 16) at 8.  A review of the administrative record indicates that Plaintiff's statement is incorrect.  Plaintiff's form including recent medical treatment was received on June 19, 2017.  AR at 271.  Dr. Chen's Physical Medical Source Statement was signed on July 19, 2017.  The Court surmises that it was therefore obtained in response to Plaintiff's designation of additional medical treatment.

The Court finds that the ALJ's observation that "[t]he treatment records do not support severe physical impairments as they are not properly documented, lacked treatment or did not meet the durational requirements required of a severe impairment" does not reflect a record that was not fully developed.  The Court further finds that the ALJ properly fulfilled her duty to fully and fairly develop the record.  *See Tonapetyan*, 242 F.3d at 1150.

## C.   *Treating Physician Testimony*

Plaintiff asserts that because "the objective evidence was incomplete despite Ms. Schneider's timely informing the Administration of her treatment providers[,] [t]here was no way for the ALJ to properly evaluate Dr. Chen's opinion."  Pl's Opening Br. (Doc. 16) at 9.  Plaintiff further urges that "there [wa]s inconsistency in the way the ALJ dismissed Dr. Chen's opinion."  *Id.*

"As a general rule, more weight should be given to the opinion of a treating source than to the opinion of doctors who do not treat the claimant."  *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1996) (citing *Winans v. Bowen*, 853 F.2d 643, 647 (9th Cir. 1987)); *see also Garrison v. Colvin*, 759 F.3d 995, 1012 (9th Cir. 2014).  "The opinion of a treating physician is given deference because 'he is employed to cure and has a greater opportunity to know and observe the patient as an individual.'"  *Morgan v. Comm'r of the SSA*, 169 F.3d 595, 600 (9th Cir. 1999) (quoting *Sprague v. Bowen*, 812 F.2d 1226, 1230 (9th Cir. 1987) (citations omitted)).  "The ALJ may not reject the opinion of a treating physician, even if it is contradicted by the opinions of other doctors, without providing 'specific and

legitimate reasons' supported by substantial evidence in the record." *Rollins v. Massanari*, 261 F.3d 853, 856 (9th Cir. 2001) (citing *Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir. 1998)); *see also Orn v. Astrue*, 495 F.3d 625, 632 (9th Cir. 2007); *Embrey v. Bowen*, 849 F.2d 418, 421 (9th Cir. 1988). "The ALJ can meet this burden by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings." *Embrey*, 849 F.2d at 421 (quoting *Cotton v. Bowen*, 799 F.2d 1403, 1408 (9th Cir. 1986)). Additionally, "[a] physician's opinion of disability 'premised to a large extent upon the claimant's own account of his symptoms and limitations' may be disregarded where those complaints have been 'properly discounted.'" *Morgan*, 169 F.3d at 602 (quoting *Fair v. Bowen*, 885 F.2d 597, 605 (9th Cir. 1989) (citations omitted)). Similarly, "[a] physician's opinion can be discredited based on contradictions between the opinion and the physician's own notes." *Buck v. Berryhill*, 869 F.3d 1040, 1050 (9th Cir. 2017) (citing *Bayliss v. Barnhart*, 427 F.3d 1211, 1216 (9th Cir. 2005)). "[T]he more consistent an opinion is with the record as a whole, the more weight we will give to that opinion." 20 C.F.R. § 404.1527(c)(4).

The ALJ set forth a detailed and thorough summary of the facts and clinical evidence. AR at 24–34. Regarding Dr. Chen's opinions, the ALJ observed that "her opinion was not consistent with the objective evidence." *Id.* at 25. The ALJ further noted that "a review of the records indicated Ms. Schneider had no formal evaluation for her fibromyalgia with confirmation of the required tender points and there was indication gallbladder surgery had resolved some of her abdominal complaints." *Id.* The medical records consistently indicate that physical examinations of Plaintiff were unremarkable with scant or no evidence of inflammatory disease. *See* AR at 695, 709–10, 720, 735, 745–46 (Dr. Birgel's physical examination was unremarkable); AR at 705 (Dr. Birgel noted that tests showed "[n]o evidence for inflammatory disease, autoimmune process, rheumatoid arthritis or anything else); AR at 742 (Dr. Birgel "[r]eviewed [Plaintiff's] comprehensive labs workup [and] even sprue panel [wa]s negative"); AR at 786 (Dr. Sarkar noted "[t]he abnormal serologies ***may*** suggest an immune disturbance" (emphasis added)). In May

2015, Plaintiff reported to Dr. Cabin that her fibromyalgia was much improved.  *Id.* at 767. Moreover, Plaintiff's gastric complaints were generally tied to dietary changes.  *See* AR at 310, 313, 333, 336 (right upper quadrant abdominal and epigastric pain after beginning a ketogenic diet).

The ALJ's findings are consistent with the medical records in this case.  The records do not support the limitations set forth by Dr. Chen.  "The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and for resolving ambiguities." *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995) (citations omitted). The ALJ provided "'specific and legitimate reasons' supported by substantial evidence in the record" to reject Dr. Chen's Physical Medical Source Statement. *Rollins v. Massanari*, 261 F.3d 853, 856 (9th Cir. 2001).  Accordingly, she did not err.

## IV.   CONCLUSION

Based upon the foregoing, the Court affirms the ALJ's decision.  Accordingly, IT IS HEREBY ORDERED that:

1)      Plaintiff's Opening Brief (Doc. 16) is DENIED;

2)      The Commissioner's decision is AFFIRMED; and

3)      The Clerk of the Court shall enter judgment and close its file in this case.

Dated this 23rd day of November, 2020.

_____
Bruce G. Macdonald
United States Magistrate Judge

- 23 -